UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re

Alan R. Bagg and Maureen E. Bagg,  Case No. 17-24668-bhl-7

                      Debtors.

Robert Heinrich,

                      Plaintiff,

v.  Adversary No. 17-02247-bhl

Alan R. Bagg and Maureen E. Bagg,

                      Defendants.

## DECISION AND ORDER

      Alan and Maureen Bagg are Chapter 7 debtors. On August 18, 2017, one of their longtime neighbors, Robert Heinrich, filed a proof of claim and an adversary complaint in their bankruptcy case. Heinrich's $425,324.05 claim is based on a state court judgment that he obtained against the Baggs for: (1) tortious interference with contract and (2) unlawful harvesting of timber on Heinrich's land. In the adversary proceeding, Heinrich contends these debts should be excepted from discharge under 11 U.S.C. §523(a)(6) because the debts are for the Baggs' "willful and malicious" injury to Heinrich or his property. The Baggs acknowledge Heinrich's claim, but deny the debts are nondischargeable.

      Heinrich initially sought summary judgment in the adversary proceeding, arguing that the Baggs were collaterally estopped from disputing nondischargeability based on the state court judgment. Because the state court verdict did not necessarily answer whether the Baggs acted willfully and maliciously, the court denied summary judgment and set the proceeding for trial. On April 11 and 20, 2018, the parties presented evidence and argument and the court took the matter under advisement. Based on the evidence and matters of record, the court now issues this Decision and Order resolving the parties' dispute.[1] The court concludes that the debts are dischargeable.

---

[1] The court has jurisdiction over the adversary proceeding by virtue of 28 U.S.C. §1334(b), and this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I). This decision constitutes the court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

# FINDINGS OF FACT

The basic facts giving rise to Heinrich's claim are largely undisputed. Heinrich and the Baggs are neighbors who own adjoining parcels of real estate in Elmwood Park, Wisconsin, a small village on the outskirts of Racine. The Baggs purchased their home and another ½-acre parcel from Heinrich in the 1980s. At that time, Heinrich retained land next to the Baggs and continued to live there.

The Baggs and Heinrich appear to have been on reasonably good terms as neighbors for the next 25 years. During this time, the Baggs made use of portions of Heinrich's property, cutting down trees and planting a garden on Heinrich's land, all apparently without any objection from Heinrich.

Neighborly relations fell apart in early 2012. During the preceding fall, Heinrich entered into an agreement to sell a 3.2-acre parcel of land directly adjoining the Baggs' property to Gatlin Development Company, Inc. Heinrich was to receive $900,000 for the parcel, which Gatlin planned to develop into a Walmart.

The Baggs were less than thrilled at the prospect of having a Walmart next door. Along with a group called the Friends of Elmwood Park, the Baggs opposed the development and took measures to try to stop it. They helped draft and send emails to municipal officials, urging them not to rezone the property, a prerequisite to the development going forward.

In addition to their opposition through the political process, the Baggs filed an adverse possession lawsuit against Heinrich on April 18, 2012. *Alan Bagg and Maureen Bagg v. Robert Heinrich*, Racine County Circuit Court, Case No. 12-CV-1408. In their complaint, the Baggs relied upon their historic use of a ½-acre portion of Heinrich's property to claim they had ownership rights to it. As required by Wisconsin law, the Baggs supported their adverse possession claim by filing a lis pendens on the property.

Because the ½-acre portion that the Baggs claimed to have adversely possessed was part of the property Heinrich had already contracted to sell to Gatlin, the lawsuit and lis pendens raised questions about Heinrich's ability to convey clean title to the entirety of the parcel he had agreed to sell. These questions led Gatlin to terminate the purchase agreement and walk from the deal.

Whether the Baggs realized it at the time or not, the death of the Walmart development was not the end of the saga between them and Heinrich. Unhappy that the lawsuit had cost him a substantial economic gain, Heinrich responded to the Baggs' complaint by denying the Baggs' adverse possession allegations and counterclaiming for unlawfully harvesting timber in violation of Wis. Stat. §26.05 (a Wisconsin statutory tort), tortious interference with contract, and slander of title. (Second Amended Answer, Affirmative Defenses and Counterclaim, Case No. 12-CV-1408, filed July 15, 2015).

In August 2015, more than three years after the Baggs filed their initial complaint, the case was finally ready for trial. On the brink of trial, the state court made a series of rulings in favor of each party. The court ruled in the Baggs' favor on a portion of their claim, concluding

that they had adversely possessed that part of Heinrich's land where they had planted a garden. Based on this ruling, the state court dismissed Heinrich's slander of title counterclaim. But the court also held that the Baggs had not adversely possessed the balance of the parcel. The court then allowed the parties to present evidence and argument on Heinrich's intentional interference with contract claim to a jury, which found in favor of Heinrich and awarded him $405,000. Finally, the court determined that the Baggs had harvested timber on Heinrich's property in violation of Wis. Stat. §26.05 and awarded Heinrich $2,400 in damages on this statutory claim.

## ANALYSIS

One of the fundamental purposes of bankruptcy is to provide debtors with a fresh start by discharging their pre-petition debts. *In re Jahrling*, 816 F.3d 921, 924 (7th Cir. 2016). While a debtor's right to a discharge under the Bankruptcy Code is broad, it is not absolute. In 11 U.S.C. §523(a), Congress has identified several types of debts that a debtor cannot discharge. Among these nondischargeable debts are those "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6).

Heinrich argues that the Baggs' debts to him are nondischargeable under this provision. As the party seeking to establish an exception to discharge, Heinrich bears the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Like other exceptions to discharge, section 523(a) is to be narrowly construed against Heinrich and in favor of the Baggs. *See In re Platter*, 140 F.3d 676, 680 (7th Cir. 1998) (noting exceptions to discharge "are confined to those plainly expressed in the Code … and are narrowly construed in favor of the debtor").

### 1. What is a debt for "willful and malicious injury"?

At first blush, the concept of a debt for a willful or malicious injury seems straightforward. The American Heritage Dictionary of the English Language defines willful[2] as "[s]aid or done on purpose; deliberate." (5th ed. 2018). It defines malicious as "having the nature of or resulting from malice; deliberately harmful; spiteful." *Id.* These dictionary definitions are consistent with an ordinary understanding of both terms.

If our analysis could rest solely on the plain words of the statute, things would be relatively uncomplicated. The court would simply look for evidence of an injury to the creditor or his property as the result of the debtor's intentional conduct, done maliciously. But years of judicial gloss added to these terms necessitates a more detailed discussion.

The Supreme Court has twice interpreted the phrase "willful and malicious" injury for purposes of nondischargeability in bankruptcy. In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the Supreme Court held that section 523(a)(6)'s exception to discharge did not apply to a

---

[2] Many provisions in the Code use the term willful. *E.g.*, 11 U.S.C. §§109(g)(1), 362(k)(1), 524(i). The word is almost uniformly understood to mean an intentional or knowing act. *See, e.g., Miller v. First Fed. Sav. & Loan Ass'n of Monessen*, 143 B.R. 815, 818-19 (Bankr. W.D. Pa. 1992) (conduct is "willful," for purposes of §109(g)(1), when it is intentional, knowing, and voluntary, as opposed to conduct which is accidental or beyond one's control); *In re McMullen*, 386 F.3d 320 (1st Cir. 2004) (§362(k) violation is "willful" if "creditor's conduct was intentional (as distinguished from inadvertent), and committed with knowledge of the pendency of the bankruptcy case").

$355,000 malpractice judgment obtained by the former patient of a debtor-physician.  The Supreme Court unanimously rejected the creditor-patient's argument that because the injury had resulted from the debtor-physician "intentionally rendering inadequate medical care," the malpractice award was one for willful and malicious injury.  The Court held that section 523(a)(6) requires a willful injury – one that is voluntary or intentional – negligently or recklessly inflicted injuries are insufficient.  *Geiger*, 523 U.S. at 64.

Nearly a full century earlier, in *Tinker v. Colwell*, 193 U.S. 473 (1904), the Supreme Court interpreted the "willful and malicious" injury exception to discharge as enacted in the 1898 Bankruptcy Act.  *Tinker* is somewhat anachronistic:  it involves a superseded statute, is written in the legalistic style of the early 20th century, and arises from a nearly defunct tort – "criminal conversation," a claim premised on a spouse's adultery.[3]  In *Tinker*, a federal district court judge adjudicated the debtor bankrupt, but, as bankruptcy procedure apparently then allowed, declined to rule on whether a $50,000 debt for criminal conversation was dischargeable.  *See In re Tinker*, 99 F. 79, 80-81 (S.D.N.Y. 1900).  When the New York state courts later ruled that the debt fell within the willful and malicious injury exception to discharge, the debtor sought review in the United States Supreme Court.  The Supreme Court affirmed, first holding that the husband had suffered an injury to his person or property because "the husband had certain personal and exclusive rights with regard to the person of his wife which are interfered with and invaded by criminal conversation with her."  193 U.S. at 481.  The Court then held the debt was for "willful and malicious" injury even though the debtor may have performed the tortious "conversation" without "any particular malice towards the husband."  The court reasoned that the conduct "itself necessarily *implies* that degree of malice which is sufficient to bring the case within the exception."  *Id*. at 485 (emphasis added).  While *Tinker* may technically remain "good law," its holding that malice can be implied in the tort of criminal conversation appears limited, given the unique facts and outmoded claim.  *See Geiger*, 523 U.S. at 63 (confirming that *Tinker* "provides no warrant for departure from the current statutory instruction" and taking pains to "confine" its holding).

The Seventh Circuit addressed the willful and malicious exception to discharge at length in *Jendusa-Nicolai v. Larsen*, 677 F.3d 320 (7th Cir. 2012).  *Jendusa-Nicolai* involved a vicious assault by the debtor against his ex-wife, an assault that later led to a monetary judgment in favor of his ex-wife and her family.  The Seventh Circuit expressed frustration in trying to fit the debt within the many formulations of the "willful and malicious" injury exception set forth in case law:  "courts are all over the lot in defining this phrase."  *Id*. at 322.  After identifying "redundancies" and "semantic confusion" arising from judicial attempts to refine the statutory language, the Seventh Circuit eventually threw up its hands.  Rather than trying to reconcile the various tests, the court simply (and sensibly) concluded that, regardless of definitions, the

---

[3] Apparently, criminal conversation is not entirely an anachronism.  It remains an actionable tort in at least five jurisdictions.  *See* H. Hunter Bruton, *The Questionable Constitutionality of Curtailing Cuckolding:  Alienation-of-Affection and Criminal-Conversation Torts*, 65 Duke L. J. 755, 760 (2016) (noting that tort of criminal conversation remains viable in Hawaii, Kansas, Maine, Mississippi, and North Carolina.); Virginia Bridges, *He slept with a married woman. Now a judge says, pay the jilted husband $4.4 million*, THE HERALD-SUN (Durhan, NC), July 26, 2018.

debtor's conduct (beating his pregnant ex-wife with a baseball bat, sealing her in a garbage can filled with snow, and leaving her in an unheated storage facility) supported a finding that the debts at issue arose from willful and malicious injury. *Id.* at 323-24.

In *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767 (7th Cir. 2013), the Seventh Circuit again addressed section 523(a)(6). *Horsfall* involved a real estate brokerage firm that argued for the nondischargeability of a $10,978.91 tortious interference with contract judgment entered against a debtor who previously worked for the firm. After a trial, the bankruptcy court held the debt was dischargeable and both the district court and Seventh Circuit affirmed. Like the creditor in this case, the brokerage firm insisted that the debtor was bound by the state court jury verdict. The court of appeals agreed, but rejected the firm's claim that it was entitled to a nondischargeability judgment as a matter of law, explaining that the verdict, for tortious interference under Wisconsin law, did not necessarily establish all of the elements required by section 523(a)(6). The Seventh Circuit then affirmed the dischargeability ruling, finding no clear error in the bankruptcy court's finding that the debtor had not intended to injure his former employer and that the injury sustained was not substantially certain to occur. *Id.* at 776-77.

In *Horsfall*, the Seventh Circuit identified three elements to a section 523(a)(6) claim: (1) an injury to the creditor or his property caused by the debtor; (2) willfully; and (3) maliciously. The court of appeals stated that in proving a "malicious" injury the creditor did not need to prove "ill-will or specific intent to do harm." *Id.* at 774-75. But in proving a "willfulness," the creditor had to prove not just an intentional act, but also an actual intent by the debtor to injure. *Id.* at 774; *see also Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir. 2015) ("*Horsfall* teaches that one must act with the specific intent to cause a certain result in order to prove willfulness."). *Horsfall's* instruction that the creditor need not prove ill intent as part of "maliciousness," but must prove a specific "intent to injure" as part of "willfulness" is confusing; these two concepts are very similar. In the end, however, regardless of whether this concept is considered part of proving "willfulness" or proving "maliciousness," the cases confirm that a creditor invoking section 523(a)(6) must prove an intent to inflict injury.[4]

---

[4] This is an example of the "sematic confusion" the Seventh Circuit itself complained of in *Jendusa-Nicolai*. 677 F.3d at 324. Reading bad intentions out of the maliciousness requirement, only to impose a nearly identical concept as part of willfulness, results in "semantic confusion," but without generating different outcomes. *See id*. at 322-24. The Seventh Circuit started down this path in *In re Thirtyacre*, 36 F.3d 697, 700 (1994), in which it adopted dicta from the Sixth Circuit stating that maliciousness under section 526(a)(6) "does not require ill-will or specific intent to do harm." At best, this language is confusing; at worst, it is self-contradictory and contrary to the plain terms of the statute. An act done maliciously, i.e., with malice, necessarily requires ill-will, bad intent or something close to it; that is what malice is. *Cf. Aikens v. State of Wisconsin*, 195 U.S. 194, 203 (1904) ("We interpret 'maliciously injuring' to import doing a harm malevolently, for the sake of the harm as an end in itself."). Moreover, the Sixth Circuit incorporated this odd formulation in *Wheeler v. Laudani*, 783 F.2d 610, 615 (1986), based on language in the Supreme Court's *Tinker* decision. Other than *Tinker*, in which the Supreme Court "implied" malice in connection with the obscure and now largely abandoned tort of criminal conversation, none of these cases has actually held a debt nondischargeable in circumstances where ill intent or maliciousness was not present. Indeed, the statute expressly requires a malicious injury and without requiring bad intent, courts "risk transforming every state-law intentional tort into a non-dischargeable debt, contrary to the Supreme Court's opinion in *Geiger*." *Horsfall*, 738 F.3d at 775.

Semantics aside, the plain language of the Bankruptcy Code and the holdings of the cases make certain requirements clear. A creditor invoking section 523(a)(6) must show that the debt at issue arises from an injury to the creditor's person or property, intentionally caused by the debtor, with some level of malice, wickedness, or a specific intent to inflict injury. *See Horsfall*, 738 F.3d at 774-75. If these things are proved, the debt is for willful and malicious injury and is nondischargeable under section 523(a)(6).

### 2. Are the Baggs' debts to Heinrich for "willful and malicious injury"?

Heinrich's claim arises from two separate injuries. First, Heinrich suffered $405,000 in damages plus interest and costs as a result of the Baggs' tortious interference with Heinrich's contract to sell his land to Gatlin. Second, he sustained $2,400 in damages plus interest and costs as a result of the Baggs' unlawful harvesting of timber from his land. Because these debts arise from different conduct, section 523(a)(6) requires that they be separately analyzed.

#### A. Heinrich has not proved that the Baggs' debt for tortiously interfering with the Gatlin contract is nondischargeable.

The record establishes that Heinrich has suffered an injury as a result of the Baggs' tortious interference with the Gatlin contract. The Baggs' lawsuit resulted in Gatlin terminating a contract to buy Heinrich's property for $900,000, when the property was appraised for only $495,000, resulting in a $405,000 financial injury to Heinrich.

The evidence also establishes the Baggs' conduct leading to Heinrich's injury was intentional. The filing of a lawsuit and the related lis pendens are both intentional, purposeful acts. Indeed, the Baggs plainly filed the lawsuit and lis pendens with the intent both to vindicate their adverse possession rights and to try to prevent the Walmart development.

The Baggs do not appear to contest either of these initial points and, even if they had, they would be precluded from re-litigating these issues, as this court previously explained in its March 28, 2018 oral summary judgment ruling. *See Horsfall*, 738 F.3d at 774-75 (holding state court tortious interference with contract verdict under Wisconsin law collaterally estopped debtor from challenging some elements of nondischargeability under section 523(a)(6)).

This leaves only the issue of whether the Baggs had a specific intent to injure or harm Heinrich (whether as part of proving "maliciousness" or proving "willfulness"). Heinrich concedes that the jury did not make a specific finding on this point. (Plaintiff's Proposed Findings of Fact ¶ 28 and Proposed Conclusions of Law ¶ 12, filed April 6, 2018).

The court is not persuaded that the Baggs acted with a sufficient intent to inflict injury (or with sufficient malice) to render their debts to Heinrich nondischargeable under section 523(a)(6). The Baggs testified credibly that they did not act to harm Heinrich. They filed their adverse possession lawsuit and lis pendens in good faith. They explained that while they wanted to prevent the Walmart development, they also wanted to protect the residential character of their neighborhood. They insisted that they had no animus against Heinrich personally or against his property.

It is significant to the court that the Baggs' lawsuit and lis pendens were not frivolous. The state court ruled that the Baggs had indeed adversely possessed a portion of Heinrich's land, the portion they used for a garden. On this basis, the state court dismissed Heinrich's slander of title claim as a matter of law. The Baggs were thus plainly within their rights – indeed their claims were partially vindicated – in suing for adverse possession and filing a lis pendens on the property. This undercuts Heinrich's argument that the injury was willful and malicious.

The mere partial success of their adverse possession claim is not dispositive. It is possible that a party in the Baggs' position could have acted with an intent to injure (maliciously) even with a valid adverse possession claim. For example, if Heinrich had proved that the Baggs knew that they had no basis to claim adverse possession over more than just the garden area, but filed their claim more broadly in order to scuttle Heinrich's deal with Gatlin, then he would have shown a willful and malicious injury within the meaning of section 523(a)(6). But Heinrich offered no evidence the Baggs' claim was intentionally inflated to kill the Walmart deal and cause him harm. The best he could muster was an argument that the jury must have found that the Baggs overreached in filing their lawsuit given the resulting jury verdict. But nothing in the verdict stands out as requiring the jury to have necessarily reached such a conclusion. Certainly the jury instructions, particularly those relating to whether the Baggs' conduct was "privileged," allowed the jury to consider a variety of factors touching on the Baggs' motivations, but that does not mean the jury actually made such findings. Nor did Heinrich present any credible evidence in this adversary proceeding that would allow the court to make such a finding. It was incumbent on Heinrich, as the party with the burden of proof, to offer such evidence, if it existed.

In closing argument, Heinrich insisted that the Baggs acted willfully and maliciously because their conduct in filing the lawsuit was "substantially certain" to result in harm to Heinrich and his property. With a nod to language in *Horsfall* and *Thirtyacre*, Heinrich argued that because the Baggs were aware that filing their lawsuit would kill the Walmart development, they acted with sufficient willfulness to satisfy section 523(a)(6).

Heinrich misconstrues the language used in the case law. While a person is certainly held to have intended all consequences that are substantially certain to result from his actions, this is not the same thing as having an intent to inflict injury, as required to sustain a nondischargeability complaint under section 523(a)(6). An intentional breach of contract might be substantially certain to result in damages to the counterparty, but that does not mean that a claim based on such a breach creates a non-dischargeable debt within the meaning of section 523(a)(6). Heinrich's construction would water down the requirements of section 523(a)(6), causing the exception to swallow the general rule that debtors are entitled to a discharge. *See Horsfall*, 738 F.3d at 775 (cautioning against the risk of "transforming every state-law intentional tort into a non-dischargeable debt, contrary to the Supreme Court's opinion in *Geiger*").

Indeed, Heinrich admitted that the Baggs' conduct in filing the lawsuit was not in fact certain to result in harm to Heinrich. In closing argument, Heinrich identified three potential outcomes from the lawsuit. First, the Baggs might prevail and have their adverse possession rights vindicated. While this would deprive Heinrich of the proceeds from the proposed sale to

Gatlin, he would not have been harmed in the legal sense; an inability to complete the sale of land one does not rightfully own is not a legal injury.  Second, Heinrich might prevail in the lawsuit and then proceed with the Walmart deal.  In this instance, he would recover the sale price and suffer no injury (other than perhaps for some delay, assuming the delay had financial consequences).  Third, Heinrich might prevail in the lawsuit, but only after the deal fell through (as actually happened).  In this circumstance, the Baggs' lawsuit would have resulted in injury.  Based on these admissions, if the first or second outcome had transpired, Heinrich would not have been wrongfully injured.  The court thus does not find that it was substantially certain that Heinrich would suffer an injury sufficient to make the Baggs' conduct willful and malicious for purposes of 523(a)(6).

### B. Heinrich has also failed to establish that his debt for unlawful harvesting of timber is nondischargeable.

Given the much smaller amount at issue, it is unsurprising that the parties spent much less time in terms of evidence and argument related to the unlawful timber harvesting debt.  The record establishes, however, that Heinrich was awarded $2,400 in damages by the state court after it determined that the Baggs violated Wis. Stat. §26.05 by unlawfully harvesting timber on Heinrich's land.  Beyond the existence of this award, the parties offered little more than passing references to this debt.

The judgment itself establishes that the Baggs cut timber on Heinrich's land and that Heinrich suffered injury as a result.  From this alone, Heinrich has carried his burden on two of the three required statutory elements.

But the paucity of evidence requires the court to conclude that Heinrich failed to carry his burden of showing a willful and malicious injury on this debt too.  None of the witnesses testified about the Baggs' intentions with respect to the timber, other than that they burned some of it in their fireplace.  There was nothing from which the court could conclude that the unlawful timber harvesting was done willfully and maliciously for purposes of section 523(a)(6).  The court therefore finds this debt is dischargeable too.

## CONCLUSION AND ORDER

Heinrich has not carried his burden of establishing that the Baggs' debts to him were for willful and malicious injury under section 523(a)(6).  The debts are therefore dischargeable and the adversary complaint is dismissed.

Dated August 10, 2018,

_____
Brett H. Ludwig
United States Bankruptcy Judge